Agar Packing & Provision Corporation v. Commissioner.
Agar Packing & Provision Corp. v. Comm'r
Docket No. 2368. United States Tax Court
1945 Tax Ct. Memo LEXIS 308; 4 T.C.M. (CCH) 186; T.C.M. (RIA) 45052; February 7, 1945
*308 I. N. Nelson, Esq., for the petitioner. Harold H. Hart, Esq., for the respondent. STERNHAGEN The Commissioner determined a deficiency of $12,205.38 in income tax for 1937 by disallowing a credit against adjusted net income under Section 26(c). The question is whether part or all of the taxpayer's net income could have been distributed without violating a contract. Findings of Fact The petitioner is a Virginia corporation engaged in Chicago, Illinois, in the meat packing business. It filed its 1937 income and excess profits tax return on the accrual basis in the First *309 District of Illinois. On December 1, 1934, the petitioner made a "Trust Deed and Chattel Mortgage" by which it conveyed, mortgaged and set over to American National Bank and Trust Company of Chicago, trustee, certain land and improvements (called its "West Side Property"), including equipment and also the rents therefrom, as security for a bond issue of $376,500, dated December 1, 1934, payable November 1, 1946. The "available net income of the mortgaged property" was to be paid to the American Bank. The "available net income" was defined as "gross cash receipts of the Company derived from the income of the mortgaged property" less (a) disbursements for current operating expenses; (b) payments or reserves to a trustee for non-depositing bondholders, complainant in a proceeding against petitioner; (c) payments or reserves for taxes and insurance; (d) disbursements for improvements; (e) disbursements for repairs and maintenance, and (f) disbursements for charges of trustee, under the trust deed. The trustee was to apply the available net income of the period December 1, 1934 - October 31, 1937, to (i) payment or reserve for taxes assessed against the "South Side Property" and machinery *310 and equipment; (ii) the payment of non-recurring items in a certain reorganization agreement; (iii) the payment of current interest on the bonds; (iv) a reserve fund for interest equal to 2 1/2 per cent of the principal of the outstanding bonds, and (v) the payment to petitioner of any balance on hand on December 1 of each year. Available net income deposited after November 1, 1937, was to be applied as provided in (i), (ii), (iii), and (iv) above, and any money remaining in the sinking fund on December 1, beginning with December 1, 1938, and any money deposited during any mortgage year for the retirement of bonds was to be applied to the purchase of bonds. All of petitioner's net income (defined as the "gross cash income of the Company from any source or sources, exclusive of the income from the mortgaged property" less certain stated deductions), together with such net income from the mortgaged property as was made available to petitioner from the depositary, was to be applied so long as any of the indebtedness of $376,500 remained unpaid in the order of priority as follows (Art. VI, Sec. 8 (c)): "(i) To augment the net income of the mortgaged property to the extent necessary *311 to pay non-recurring items assumed by the Company and provided to be paid by it pursuant to the agreement for reorganization of the mortgaged property and other property, as set forth in the schedule, identified by the signatures of the Trustee and of the Company, duplicate originals of which shall be delivered to the Trustee and to the Depositary, as set forth in sub-paragraphs A-(ii) and B-(ii) of Section 2 of Article IV hereof; "(ii) To augment the net income from the mortgaged property, as defined in Section 4 of Article III hereof, to the extent necessary to pay the semi-annual interest payments on the bonds as and when due and accumulated interest, if any, on the bonds; "(iii) To augment the said net income from the mortgaged property to the extent necessary to the creation and maintenance of the interest reserve fund provided for in sub-paragraphs A-(iv) and B-(iv) of said Section 2 of Article IV hereof; "(iv) To the payment of the reasonable charges and expenses of the Trustees and the Depositaries under certain Trust Agreements dated as of December 1, 1934, described in Section 6 of Article XV hereof; "(v) To the accumulation of working capital for the Company until *312 such working capital, represented by the difference between current assets and current liabilities (as said terms are hereinafter defined) shall amount to Five Hundred Thousand Dollars ($500,000.00); provided that if the accumulation of such working capital to said amount shall not be completed within three (3) years from the date of this Indenture, further accumulations for working capital shall be deferred until after the payment of all current and accrued dividends upon the first preferred stock and the second preferred stock of the Company, as hereinafter provided; "If the net assets of the Company (after reasonable provision for depreciation of the real property, machinery and equipment of the Company for current and prior years) shall be in excess of its capital (as said term shall from time to time be defined by the laws of the State of Virginia), then any remaining net income, to the extent that the net assets shall be in excess of the capital of the Company, shall be applied as follows: "(vi) To the payment of current and accumulated dividends on the outstanding first preferred stock of the Company; "(vii) To the payment of current and accumulated dividends on the outstanding *313 second preferred stock of the Company; and "(viii) Any balance of said remaining net income of the Company shall be deposited with the Depositary under this Indenture on January 1 of each year, beginning January 1, 1936, for application to the purchase or redemption of the bonds hereby secured, in accordance with the provisions of sub-paragraph B-(v) of Section 2 of Article IV hereof." Current assets were defined as cash, including checks and drafts, receivables, inventories, supplies, raw materials, products in process of manufacture and peparation, finished goods, investments at market price, including cash surrender value of life insurance policies and stocks and bonds, and all assets of petitioner, except its book values of plant property and equipment and deferred charges. Current liabilities were defined as all liabilities of petitioner except the liability for the indebtedness secured by the trust deed and any indebtedness incurred in connection with the acquisition of equipment and machinery incident to the business of petitioner. The trust deed provided that until some default petitioner was permitted to retain the property and operate it and collect the income subject *314 to the provisions as to the application of the income from the mortgaged property. The trust deed and chattel mortgage was in effect throughout 1937. The petitioner on June 15, 1937, filed under the Revenue Act of 1936 an unjust enrichment tax return for 1935 and for the period January 1 to January 6, 1936, showing no taxable income or tax due. On June 30, 1937, it filed a claim for refund of $1,424,900.65 processing tax paid, and also a claim for refund of $17,699.40 floor stocks tax paid. On June 30, 1937, a claim for refund was filed in the name of Union Packing Company for $1,196,301.83 processing taxes paid, and a claim for refund of $17,699.40 floor stocks tax paid. These claims filed in the name of Union Packing Company were assigned to petitioner on December 31, 1935, and during 1937 petitioner was entitled to any recovery which might be had with respect thereto. On June 7, 1940, a notice was mailed to petitioner in which it was advised of an unjust enrichment tax deficiency of $356,557.38 for 1935. By letter dated June 30, 1942, the Commissioner accepted a proposal of settlement made by petitioner upon the basis of a deficiency in unjust enrichment tax including interest *315 of $50,000 for 1935, no deficiency in unjust enrichment tax for 1936, and disallowance in full of the claims for refund filed by petitioner and the Union Packing Company for processing taxes and floor stocks taxes, which claims were waived by petitioner on the condition "that there will be no adjustment to income for income and excess profits tax purposes for any year or current due to the settlement of the unjust enrichment tax and processing and floor stocks tax claims." The assets and liabilities on December 31, 1937, as shown by petitioner's books of account, were as follows: ASSETS
Current Assets: Cash
$ 163,608.12
Receivables
$291,131.81
6,903.84
284,227.97
Inventories
Packing house products
585,062.96
Supplies
21,602.30
606,665.26
Deposits with Trustee (for taxes and interest under first mortgage
bond indenture, including current sinking fund requirements of
$3,642.93 per contra
42,102.15
1,096,603.50
Other Assets: Cash surrender value of life insurance
15,611.87
Plant property and equipment
South Side Property (Packing House)
Land
175,125.00
Buildings and improvements
$432,710.28
Machinery and equipment
303,442.69
736,152.97
Less - Reserve for depreciation
124,009.23
612,143.74
West Side Property (Mortgaged Property)
Land
100,000.00
Building
265,000.00
Less - Reserve for depreciation
23,850.00
241,150.00
1,128,418.74
Deferred Charges
13,239.12
Total Assets
$2,253,873.23
LIABILITIES
Current Liabilities
Accounts payable
$ 46,698.75
Accrued wages, fees and expenses
40,653.73
Accrued real estate, Social Security and miscellaneous taxes
48,219.42
Accrued interest
3,280.26
Reserve for 1937 federal income tax
7,343.24
Reserve for 1934 and 1935 federal income and excess-profits taxes
165,388.75
Current sinking fund payable - per contra
3,642.93
$315,227.08
Reserve for canning and food condition losses
1,500.00
Funded Debt: First mortgage bonds
350,700.00
Capital Stock and Surplus: * First preferred, no par value
481,721.52
* Second preferred, no par value
242,412.12
Common, no par value
2,389.88
$726,523.52
Surplus: Contributed surplus
$314,952.81
Earned surplus (deficit)
(228,627.07)
Surplus arising from invalidation of processing taxes
773,596.89
859,922.63
1,586,446.15
Total liabilities, capital and surplus
$2,253,873.23
*316 Neither the claims for refund of processing and floor stocks taxes nor any unjust enrichment taxes are reflected in the above balance sheet. The amount of $773,596.89 represents unpaid processing tax included in petitioner's cost of goods sold restored to income in 1936. An audit was made by a certified public accountant in order to determine the net income of petitioner for 1937 in accordance with provisions of the trust deed. The statement of the net income of the company for 1937 determined by such accountant shows net income for 1937 of $3,865.09 applicable under the trust deed to the payment of charges and expenses of trustees and depositaries under voting trust agreements relating to petitioner's capital stock aggregating $4,005.50. The statement contained the following: "NOTE: The balance of net income of the Company, for the three years ended December 31, 1937, applicable to the accumulation of working capital of $500,000.00 and/or to the payment of accumulated dividends on the outstanding first and second preferred stocks of the Company, *317 amounted to $150,780.41. "Working capital at December 31, 1937, amounted to $808,727.41, which arose as follows: (Computation of working capital omitted) "Although the net income of the company amounts to $150,780.41 and the working capital, as shown above, exceeds $500,000.00, the availability of the net income for the payment of dividends is subject to the final determination of the windfall taxes, if any, that may be assessed against the company on account of unpaid processing taxes, and the consideration of the amount of such windfall taxes as assessed in determining the net working capital." The Commissioner, after investigation, determined that petitioner's taxable net income for 1937 was $68,680.51. The correctness of such determination is not disputed by the petitioner. The minutes of a special meeting of petitioner's board of directors held on December 15, 1937, contain, inter alia, the following: "After full consideration of the provisions of the trust deed and chattel mortgage and the other matters with respect to dividends, the directors, acting unanimously, concluded that they were without authority and unable to declare any dividend in any form whatsoever *318 on the stock of the corporation." Memorandum Opinion STERNHAGEN, Judge: The Commissioner disallowed an undistributed profits surtax credit, under Section 26, on the ground that the taxpayer's 1937 net income "might have been distributed within such taxable year as dividends without violating any provision of the trust deed and chattel mortgage dated December 1, 1934". The trust deed and chattel mortgage is a contract executed by the taxpayer before May 1, 1936, and it contains a provision which expressly deals with the payment of dividends. The taxpayer rests its contention that dividends were prohibited in 1937 upon the proposition that the provision is an express prohibition of dividend payments which would have been violated if a dividend had been paid within the taxable year 1937. It argues that by the provisions which require it to build up and maintain a working capital of $500,000 before declaring a dividend its income was throughout 1937 necessarily withheld from distribution as * dividends. This, however, is to ignore, as the taxpayer does, the fact that such restriction expired on December 1, 1937, and that thereafter the taxpayer was free, and indeed required, to pay *319 the current and accumulated dividends upon its outstanding first and second preferred shares. The contract (Art. VI, Sec. 8 C (v) (p. 46)) expressly provides that the net income shall be applied as set forth and in the order stated, which, after paragraphs (i), (ii), (iii), and (iv), requires, in paragraph (v), the accumulation of working capital of $500,000 - provided that if the accumulation of such working capital to said amount shall not be completed within three (3) years from the date of this Indenture, further accumulations for working capital shall be deferred until after the payment of all current and accrued dividends upon the first preferred stock and the second preferred stock of the Company, as hereinafter provided; If the net assets of the Company (after reasonable provision for depreciation of the real property, machinery and equipment of the Company for current and prior years) shall be in excess of its capital (as said term shall from time to time be defined by the laws of the State of Virginia), then any remaining net income, to the extent that the net assets shall be in excess of the capital of the Company, shall be applied as follows: (vi) To the payment of *320 current and accumulated dividends on the outstanding first preferred stock of the Company; (vii) To the payment of current and accumulated dividends on the outstanding second preferred stock of the Company; and (viii) Any balance of said remaining net income of the Company shall be deposited with the Depositary under this Indenture on January 1 of each year, beginning January 1, 1936, for application to the purchase or redemption of the bonds hereby secured, in accordance with the provisions of sub-paragraph B-(v) of Section 2 of Article IV hereof. The date of the indenture was December 1, 1934, and therefore paragraph (v) expressly requires current and accrued dividends on the first and second preferred shares to be paid after December 1, 1937, and distribution of such dividends could have been made without violating the terms of the contract. After December 1, 1937, the use of net income to build up working capital to $500,000 was not required by the agreement, but, instead, the income left after the four prior-prescribed uses was dedicated to the preferred dividends. This amounted to $102,942.14 accrued dividends on the first preferred and $51,802.59 on the second preferred. *321 This is a provision expressly dealing with the payment of dividends, not by way of prohibiting them but by way of requiring them. The fact that the unrestricted period of 1937 was limited to the single month of December does not operate to destroy the fact that in the year 1937 the distribution could be made without violating the contract. . The taxpayer argues that there was insufficient income to enable it to distribute dividends, because in 1937 it was subject to a liability of over $350,000 for windfall tax. This argument is related by the taxpayer to the requirement to build up working capital to $500,000. But the argument is untenable. No liability for windfall taxes was recognized by the taxpayer in the year 1937, and nothing was accrued on its books as such a liability. Cf. ; ; ; . It filed its return in June, 1937, showing no tax on unjust enrichment. *322 Not until June, 1940, was it advised by the Commissioner of a tax of $356,557.38 for 1935. This, together with any liability for 1936, was settled in 1942 by an agreed payment of $50,000. As of December 31, 1937, there was no accrual of processing tax or unjust enrichment tax on the taxpayer's books, nor was there anything otherwise to indicate a liability in fact of any amount; but, on the other hand, the balance sheet showed a surplus of $773,596.89 arising from the invalidation of processing taxes, and a net surplus amounting to $859,922.63. The statement by the auditor recognizes a balance of income on December 31, 1937, of $150,780.41, which he treats as committed to the accumulation of working capital, and it is also said that the working capital at that time exceeded the required $500,000. It would appear therefore that the amount determined by the Commissioner of $68,680.51 as the taxpayer's net income for 1937, and more, at least up to $150,780.41, was available to the taxpayer for the distribution of dividends in 1937, and that it is not entitled to a credit for dividend restriction under Section 26(c)(1). Decision will be entered for the respondent. Footnotes
*. Dividends accrued and unpaid at December 31, 1937, on first preferred were $102,942.14 and on second preferred were $51,802.59.↩